We're here for the one case, Brakeiron v. Horn et al., number 08-9003, Ms. Van Wyk and Mr. Barker. Good morning, Your Honors. I'm Claudia Van Wyk. Can you hear me if I have the mic like this? Perfect. I'm with the Capital Habeas Unit of the Federal Defender. On behalf of Mark Brakeiron, I'd like to request five minutes for rebuttal. That's fine. Thank you. The Court has six individual points before today. I'd like to concentrate on the first three points of our brief, which have a common element. They all require an assessment of the testimony of one Commonwealth witness, a jailhouse informant named Ellis Price, against the testimony of Mark Brakeiron, both going to what Mr. Brakeiron's intent was with respect to the robbery. Mr. Brakeiron was the only witness who undertook to provide a defense version of what happened after everyone else left the bar the evening of the homicide, the only person who could say directly what his intent was. And Ellis Price was the only person who undertook to say anything for the Commonwealth about what happened at that point in time. Did the government have no case in the absence of Price's testimony? No, that's not the case. And if Your Honors are referring to the Brady point, that's not our burden. The Brady evidence would have been material even if there might have been a sufficient case. The question is whether there's a reasonable probability that the outcome would have been different. And Price was very damaging to the robbery defense. Price gave us a completely different account of events than Mr. Brakeiron did. Without him, Mr. Brakeiron would have been unrebutted. Mr. Brakeiron said that the altercation arose between him and the victim. At some point, he passed out. He woke up and found she was dead. He fled. He returned. And at that point, he- Basically, all you can get from this is a new trial, right, on the robbery? That's correct. Because- That's right. Okay. Yes, and the district court has already ordered- granted habeas relief that would result in a new trial on the first-degree murder case. Zero in on how the Brady material infected the robbery. Certainly, Your Honor. Because Judge Fisher pointed out that he did not, when testifying, refute what Ellis said. Brakeiron did not refute what he said. He just testified to something different? Well, what Judge Fisher said was that Brakeiron did not directly say that Mr. Price's version was false, but they had contradictory versions. And I think it's important to note, with respect to the robbery, without Ellis Price, if a jury had discounted Ellis Price, Mr. Brakeiron's version would have been unrebutted. But Price offered no testimony respecting the robbery, did he? Price's description of the events would have negated Mr. Brakeiron's account, which provided that the robbery occurred as an afterthought, which would have been a viable defense under Pennsylvania law. But the testimony that he presented was solely with respect to the murder charge, wasn't it? Well, he provided a description of things that happened, including the fact that according to Price, Mr. Brakeiron said he hid in the bathroom beforehand and waited for everyone to leave. Giving the impression that he was going to do a robbery. He was planning something, yes. And I should point out some of the grounds that the district court relied on in finding Price's testimony material on the murder are equally true with respect to the robbery. The district court stated that the Commonwealth relied on Price to support the case, that it was a planned, premeditated act, and she was referring to that same testimony we just discussed that Brakeiron supposedly said he was hiding. Price didn't say that Brakeiron told him why he was hiding, what he was planning, just the fact that he was hiding. And that could equally support an inference that he was hiding with an intent to do a robbery or an intent to do some kind of an assault. So that if the jury discounted that testimony, it would have had a very helpful impact on the defense because Mr. Brakeiron's account does not have that element of planning in it. Your point is that you can't separate these things out. That's right. In other words, we're deprived of Brady material, which could be used to discredit with respect to the homicide as well as the robbery? That's right. I think Judge Fischer tried to divide something that couldn't be divided. I would like to just run through briefly the series of reasons that Price was so material to the robbery. First of all, as I said previously, without Price, Mr. Brakeiron's account that the theft was an afterthought would have been unrebutted. Price testified that Mr. Brakeiron told him he, quote, finished her off at a different location. At his father's house? At his pap's house, which would have meant, under the facts as described by either of them, that the theft couldn't have been an afterthought. So that part of Price's testimony was very damaging to the robbery defense. And finally, as I just mentioned, Price said he hid until everyone else left the bar, implying planning. And the Court should consider the fact that both parties considered the case a credibility contest between Mr. Brakeiron and Price. Defense counsel argued that. The district attorney extolled Price's credibility and summation. He said that Price had, quote, nothing to gain at all, that the jurors should consider whether he had any bias or interest. And then the last thing the Court should consider is that the jury asked a question during deliberations, and this appears in the appendix at 1669. They wanted to know if Mark Brakeiron had testified that he took the money bags and put them in the back of the truck. Ms. VanWick, can you touch on the, it seems like a threshold issue, which is, for me at least, it's the waiver of this claim. Certainly. Because when did you learn about the denial of Brady material, and when did you first raise it before the Court stated federal? Okay. Are you talking about whether any of the Brady claims was defaulted? Yes. The fact that Price had a crim and falsi conviction and the fact that Price had been previously convicted of an attempted homicide that was vacated, those two facts, those were raised in the second PCRA. There's three Brady items that I can think of. But the question is, when did you first raise it? Yes. Those two pieces were first raised in the second PCRA, were held to be untimely by the Pennsylvania Supreme Court. So you did raise them in your PCRA proceedings. Yes. Then two more pieces of evidence, one related to one of the previous ones, came out during habeas. First, there was an amendment to the habeas petition filed when it was disclosed that Price had written two letters to the district attorney seeking benefits on that prior attempted robbery conviction, and it turned out that that conviction was vacated just around the same time he gave a statement to Trooper Brownfield, and during the time when the Commonwealth was deciding whether to appeal the vacation of that conviction, and it turned out the Commonwealth never appealed it. Then there's one last thing, if I might. During discovery on the habeas proceedings, it emerged that he was also under investigation during the entire period of this prosecution and conviction for a completely different, very serious robbery and assault. He was never charged. He was under suspicion with two of his brothers and a third person named DiMatteo who gave a statement saying the three Price brothers committed this assault. His two brothers were convicted and sentenced to substantial prison time. He was never charged. That's pretty egregious stuff. And so that came out. Did you present this then in your first application in the district court? We promptly brought that. As each of those subsequent pieces came out in district court, they were presented. Judge Standish ruled as to the ones that had been presented in state court that the procedural bar was inadequate because it was based on a statute of limitations that was not enacted until after the default. You specifically presented the Brady violation in the district court. Yes, yes. And we presented the last two pieces of evidence that cropped up. During habeas proceedings, Judge Standish ruled and Judge Fisher carried forward that ruling that if we could establish the second and third prongs of the Brady violation, that would also establish cause and prejudice to excuse the default. And in both instances, Judge Standish and Judge Fisher were relying on Strickler v. Green and Banks v. Dredge, which specifically so hold. And also, this court has made similar rulings several times in reliance on that authority. So this court really has to engage in de novo review of the second two prongs of the Brady claim as they apply to the robbery in order to review the part of the Brady ruling that's before you. Now, Break Iron's testimony, even looking at Break Iron's testimony, helped me understand something here about Pennsylvania law. This was alleged and tried as a homicide committed in the course of a theft, or however the magic words are. But at least the Pennsylvania Superior Court has defined in the course of committing a crime if it's in flight afterwards. Now, Break Iron testified that he went back to the bar and took the body, or the person, that was cold. Let's assume it's a body. She's a body by that time. And the purse. And then he fled. Why is that not a theft committed in the course of a homicide because he did it while he was fleeing the scene? It depends on which is the first crime and which is the second. And certainly force in the flight from the theft would be sufficient. This is a defense under Pennsylvania law. Or is it theft or robbery, actually? Well, if you want a felony murder, it has to be a robbery. If you're talking about the definition of robbery, the underlying offense has to be the theft. The force can be in the flight after the theft. What is not a robbery under Pennsylvania law is if you switch it around and the force, including a homicide, comes first and the theft is after the homicide. Just so I can follow, the felony murder was the theory of the Commonwealth's case? Yes. Yes, and it was an aggravating factor on the – Was that robbery, a homicide committed in the course of a robbery? Yes. Okay. Yes. Could you also address the other elements of the arguments made? Preclusion of testimony about intent. Yes. Let's start with that one. Yes. That point is really pretty simple. The judge prevented counsel from eliciting a whole series of questions about what Mr. Braykarn's intent was and when it arose because he said – I thought the problem was it's irrelevant what his intent was when he went into the bar. What was relevant was what was his intent at the time of the encounter with the murder victim. Yes, and that's exactly why this is such a harmful error, Your Honor, because counsel tried and he said later during the charge conference he was planning a series of questions about his intent. He got through, you know, one of them and the objection was sustained. He got through another very general one about, you know, why did he go to the bar to have a good time. Then he tried to ask – He got that in, didn't he? He got that one in and that was not very focused on the key part of the chronology under an afterthought theft offense, which is when did your intent to steal arise. What was important was the time frame after everyone left the bar, not when he first got there. In his own testimony, though, when he testified, didn't he testify to what his intentions were? He wasn't allowed to, Your Honor. In his own testimony? In his testimony. He was allowed to – you know, it's just two pages of transcript that begin on 1559. I think the judge says – I'm sorry. It depends on what he did. He was – yes, he was allowed to describe what he did, but the law is he was entitled to take the stand, look the jury in the eye, and say what he intended. That was the only element that was in dispute. It wasn't in dispute that he stole the property, nor was it, you know, in dispute that a homicide occurred. The question was, was it an afterthought? He couldn't do that unless he was allowed to answer those questions. Does this fall in the category of harmless error? I don't think so. The rest of the testimony that was presented? I don't think so, Your Honor, because remember the Commonwealth's position was we've proven our case because we have those two pieces. We have the homicide, and he's admitted he's taken the property. We don't need any more. That was the – He at least admitted or conceded that he committed the theft, didn't he? Yes. Yes.  Did the Commonwealth ever argue that Brake Iron went to the bar with the intent either to commit murder or a robbery? I don't think they made – I don't think the Commonwealth made that specific argument, and that makes this error I think all the more damaging because he was permitted to talk about something that wasn't really in dispute. But if that's the case, I mean, when he went back to the bar and he grabbed two bags of money, wasn't his intention to steal, to commit a theft? That's not relevant to the robbery. Under Pennsylvania law, it's not a robbery unless that intention was either contemporaneous. I'm sorry, Your Honor. Don't you need a theft to have a robbery? You do need a theft, but you need more than a theft. You need a theft plus contemporaneous or preexisting intent, and that's what he was prevented from telling the jury, and he was prepared to do so. And it's quite clear counsel asked for a sidebar asking to understand the court's ruling. He gets out half the sentence saying, well, it goes to. He's trying to explain what he's trying to do, and the judge very clearly cut him off and forbade him from asking any more questions in that vein. Time moves so quickly, but I did want to hear a little bit about the failure to instruct a jury as to the lesser included offense of theft. Certainly. Hang on a minute. I should just as far as standards of review go, let me make clear that this is an ineffective assistance point on point, and it was raised on the first PCRA on the performance prong of Strickland. Your review is de novo because the Pennsylvania Supreme Court assumed that counsel should have asked for the lesser included offense instruction and based its ruling on prejudice. So as to prejudice, the court's review is subject to AEDPA standards, but the performance prong is de novo. As we noted before, theft is part of a robbery offense, and inasmuch as the jury found the defendant guilty of robbery, doesn't that presumptively establish that they found the theft offense? It does not presumptively establish that there's not even a reasonable probability that they might have found the lesser offense if they had the correct instruction. If they had an option to convict a theft on the theory that the intent didn't occur until it was an afterthought. So your argument is the jury was given an all or nothing option. Yes, that's right. But they were instructed that you have to find a theft in order to find robbery. But that's sort of non-responsive to the argument. The argument is they should have been given an option to conclude that the theft was an afterthought. That was the defense. Counsel so testified at the PCRA hearing, especially on cross-examination, he makes it very clear that he was going for theft because she was already dead, and he conceded that he didn't ask for a theft verdict. I think that was blatantly deficient because his lack of requests for a lesser included gave the jury no way to give effect to the only defense that he had on robbery. What explanation did he offer for why he did not ask for that? He gave none. So there was no strategic reason on this matter? No. I didn't think so. No, he didn't offer any reason, and that was definitely his strategy. And I think it's important to understand that even if it had been such a strategy, you really couldn't get this afterthought concept from the charges given. So it would have been an ineffectively pursued strategy if it had been his strategy. Could you talk about the voir dire issue, the ineffective assistance of counsel pertaining to voir dire? Certainly. The gist of that point is that a jury Would you know what happened? I'm sorry. Is there any person said that in the presence of it was alleged in the presence of others that this person, Brakeiron, had done robberies, and one of these people who was in that particular group ended up on the jury? That's right. We don't know if that person actually heard that comment, do we? We don't know, but the person was in the courtroom. He was a member of the panel that was present when everybody was being subjected to group questioning. May I ask you something? Yes. Was this done in the court in the presence of the judge and both attorneys? Yes. So certainly defense counsel heard it? Yes, and this is an ineffective assistance point. The claim is that counsel would have had a very strong basis under Pennsylvania law for seeking a mistrial, supplemental questioning, instruction, some kind of curative action, and the lower courts rejected this claim because the juror did say that he could be fair and not be influenced by other matters, but the portion of the transcript that they refer to has to do with his questioning about his exposure to pretrial publicity. He was never questioned about whether he was exposed to or he had heard what this other juror had said. And I should point out how damaging this is, especially for the robbery, for any member of the jury to be exposed to the idea that there was a series of robberies. The defendant, I assume, was in the courtroom. The defendant was in the courtroom. And the defendant and defense counsel consulted as to each juror as to whether they would be seated or not. And apparently they agreed that this juror could be seated. Didn't they have a right to make that decision and say to themselves, well, notwithstanding what this other potential juror said, could this particular juror, I guess it was Manges? Manges, yeah. I don't know how he pronounces it. Could be fair and impartial. Well, the argument is that counsel was ineffective for not seeking some kind of corrective action, at least for the questioning of the juror before that decision was made. There wasn't enough information to decide whether the juror had heard it and whether it had affected him. And so that's the gravamen of our claim. What standard do we use to evaluate this claim? This claim is the reverse of the other one. The Pennsylvania Supreme Court ruled on the merits on the first prong of Strickland and didn't reach the second prong. So your review of the first prong is subject to AEDPA and the second prong would be plenary. And I see my time is almost up. I just want to mention before I sit down that, of course, our claim is that these four errors work together, and if none of them individually require relief, you should grant relief cumulatively applying the standards in breadth. Are you able to say which of these four claims you really think might have affected the entire trial? I think the place where the judge said, I'm not interested in intent to kill because he told the jury to disregard the one little piece of relevant evidence that the defendant was in. You mean the preclusion of the testimony? The preclusion of the testimony, yes. Thank you, Your Honors. Thank you. Mr. Barker. Thank you, Your Honor. Good afternoon. May it please the Court. James Barker from the Office of Attorney General. I'll start with the Brady claim. We've argued extensively that there was no testimony from this witness, Mr. Price, about the robbery. If you read through his testimony, the entire statement that was provided to him by Mr. Brakeiron related to the homicide. But the district court did pass on this, did it not? Yes, it did. Now, our waiver argument, I think, turned into a procedural default argument in prior counsel's argument. What we said was that this issue, as it's argued, was not presented, not developed fully until the appellate brief. Everything up until now has related the Brady claim to the homicide. And so the district court really didn't address at length this aspect. But they did address the claim entirely. They addressed the Brady claim, but the materiality analysis would have gone to the homicide, not to the robbery. And so that's what we're saying is the new part of this. I've always thought of Brady as, you know, it affects the credibility of a witness. Correct. I mean, you use it to discredit that witness as to all his testimony, all aspects of it. So I found it a little hard to comprehend why it can pertain to homicide but would not be relevant to a robbery. I don't see how you can separate that one. If you have it in the context of a trial, you can use it to discredit the witness for everything. Everything that that witness testifies to. But the witness didn't testify about the robbery, so discrediting his testimony wouldn't affect that. No, he did testify that Brakeiron went into the bathroom and stayed there until all the patrons left. Ostensibly the implication he had the purpose to commit robbery. Well, with respect to that, this was Mr. Brakeiron's statement to him. So it would have been Mr. Brakeiron who described that, at least according to Mr. Price. The problem still is. I don't understand that. Yes, that's what he says Brakeiron told him, but his credibility is what we're concerned about here. Right, and with respect to that. I wouldn't have told him anything at all. Well, it's still good. Everything that he testified about was about the robbery. He didn't mention any money. He didn't mention any timing of it, anything like that. Now, according to what we've heard here in the district court. His testimony went to the fact that he was lying and waiting there to do something, and the rest of the testimony was that the, his testimony was that the homicide was, I shouldn't use the word fortuitous, but it just sort of happened. She clobbered him and he killed her. But Ellis' testimony is that he was in the bathroom, and up until that point, we know no intention of his to commit a homicide. So the obvious inference of that, that he was waiting until everybody left so he could rob her. That may have been the inference, but that wasn't the testimony. The testimony was that he was in there and he came out. All reasonable inferences from the testimony that's presented. That would be a reasonable inference from Ellis' testimony. That's correct. However, he still didn't testify that that's what he was planning to do. For all you know from his testimony is that he was planning to kill her. Now, we don't know why he wanted to kill her. Neither witness gave testimony to that effect. Break irons or Price's testimony? Price is the one who testified he was in the bathroom waiting. But he doesn't say why. Well, he doesn't say why. It's a matter of what the jury was going to infer. Well, the jury could infer that he was waiting to kill the victim because it could infer that he was waiting to rob. But there's an absence from his statement of anything about a robbery. The only thing he talks about is the homicide. And he doesn't even say anything about the money being taken later, the money and the purse. You know, the problem is we really don't know what the jury would have made of this very damaging, impeaching testimony. Well, the damaging extent of it is actually kind of limited. These letters that are written in the summer of the investigation, he is told after that repeatedly, no deals. But he's inviting, he's asking for you to give him a deal. I mean, if I were a defense attorney, I think they would have a field day with this. And there were only two potential deals, supposedly, that he could have gotten. One was with respect to the criminal attempt homicide. That's not the focus, though. It's not what you would have done. It's what he was trying to do. Correct. And that's what I'm trying to get at. I apologize. The time of trial is the time that you're impeaching him. At that time, his criminal attempt homicide appeal was gone. The Commonwealth could not appeal the entry of the judgment as a matter of law. So there is nothing for him to be seeking with respect to that. And with respect to the other case, which was this investigation that he was a suspect in, he had no idea of that. No one had communicated that to him. He testified at the district court hearing that he knew nothing about it. So as far as he knew, he wasn't a suspect. There was no deal for him to be seeking at trial. I think the problem is that none of that was presented to a jury. And what could have been presented to a jury is what he was hoping to get. And I agree with that. I would also point out that with respect to the impeachment with the assault with intent to rob, the jury knew that he was serving eight to 60 years for an assault. You know, if it's just an assault, which is, you know, the way it's presented, you don't get 60 years. He has been released from that, hasn't he? He was paroled. I believe he served something like 11 1⁄2 or 12 years was his testimony. Well, the Brady information, which is three points, that Price had been convicted of a criminal falsity crime. He sought a deal in exchange for his testimony, and he was a suspect in a pending investigation. Why in the – how did that not come out? Do you know what – I'm not saying you were president to creation either, so. I think under the modern rules of discovery, it would have. I can't really explain how a defense attorney wouldn't have known what the charges were in Michigan. They didn't have modern rules back in 1990? Well, apparently there was not complete discovery. And as a matter of fact, I believe it was defense counsel, Mr. Bowser, or it may have been Mr. Morrison. I believe it was Mr. Morrison who said the problem was discovery was more limited back then. Judge Morrison. I had the same thought, Mr. Barker, as Judge Ambrose had. How could this not have been disclosed? It just seems so egregious. It seems a little strange to me as well. Brady's been around for some time, and so it's – I'm surprised that it didn't come out. Secondly, back to Judge Fuentes' question at the outset here, if this was deemed to be something that would cause you not to object with regard to the overturning of the murder conviction, why would it not be deemed equally damaging with respect to the robbery conviction? Your argument is, well, he only talked about murder and not robbery. But certainly a jury could imply from things that we've said that, in fact, there was some intent formed to do a robbery. Well, and I think the general circumstances would have suggested that. One of the questions asked was whether or not we had a case without Mr. Price. And I think we absolutely have a case. What's the point of killing her except to take the money? Why are you waiting around until after the bar is closed? I think the inference is fairly obvious there. So, yes, we had this testimony, but it wasn't the only thing that the jury had. Okay. Spend some time with the intention and the limitation of the question. The problem with that claim is that the questions that were asked about intent were not at the time of the homicide. In fact, what was going on in Mr. Brakeiron's mind at the time did come in. Well, wait a minute. One of the questions that was an answer that was struck, what intentions, if any, did you have to take any money? There's no temporal limitation on that. But that followed up when you went to shenanigans. The question before that related to when you went into shenanigans. So it did not place it in the time that the robbery and the murder. I don't see any time limitation on it. Isn't intent, I mean, isn't one of the elements, critical elements of an offense? Oh, yes, absolutely, for both of these offenses. Why can't you ask the defendant, did you or did you not kill her, or did you or did you not intend to commit a theft? I mean, it seems like the question is so basic, and it goes right to the heart of did you do it or didn't you do it. It's a little bit surprising that this objection was granted. It was a little bit surprising to me when I read the transcript that there was an objection raised. I think if we were at the time discussing the time of the robbery, discussing the time of the homicide, then his intention is relevant, and there would have been no reason for it to be kept out. But the judge said categorically, we are not interested in what he intends. It's only what he did. We already know, everybody knew in that courtroom what he did. He had committed a homicide. The intentions are the critical thing. And the judge says, I don't care what he intended to do. How do we deal with that? Right, well, the fact is that the later testimony actually brought his intentions in. And separate testimony between the two objections said that, oh, I was just out for a good time, talked to some people, watched some TV. And that was his intention when he went out, when he went into shenanigans. He was never asked later about what was going on. However, he testified that at the time of the homicide he was unconscious, apparently. He gets hit over the head. We don't know who hit him. I guess the implication is that for whatever reason the bartender hit him, but we don't even know that. He's just suddenly struck. And then he says he wakes up and there she is with a knife sticking out of her. He doesn't even say it's his knife, so we don't know that he's the person who put that knife into her. So that's the testimony that shows what his intent was with respect to the homicide. And then his intent with respect to the taking of the money, he says he didn't even know it was there until he had already taken her body out to the truck. And so he went back and he took the person, the money. Were lesser-included offenses of homicide presented to the jury? Yes. There were four degrees presented. It was the three degrees of murder, murder one, two, which would be the felony murder, murder three, and then voluntary manslaughter. So, therefore, if aggravating circumstance would be if there were a felony accompanying the murder, i.e. a robbery, that would seem to be pretty significant if it was a felony versus a theft. And if you're going to have various gradations of murder instruction, why in the world would you not have at least two gradations of a robbery slash theft instruction? I believe, now I can't tell you what was subjectively going through this attorney's mind, but it seems to me that his client has testified that there was no robbery. It is Pennsylvania law that if the intent to steal forms after the use of force, then there is no robbery. If there's no robbery, then, I mean, was his strategy all or nothing, or was his strategy to say, look, you could conclude it was a theft, and, therefore, if nothing else, it eliminates an aggravating circumstance for purposes of the death penalty. And that's true, except that it appears what he was trying to do was not get the robbery conviction at all, which would also have removed an aggravating circumstance. Well, that begs the question, of course, why wasn't that deficient performance? Why wasn't he ineffective? And I can't say, you know, we make an argument on the one hand that it wasn't a robbery, and he pursues a strategy that it wasn't a robbery. And yet, you know, the defense argument now is that he was deficient for following what their own strategy is. The defendant's testimony was? No, no, just to flip to that. It wasn't a robbery. It was a theft, and the jury should have had before it the option of choosing theft rather than all or nothing between a crime versus no crime. But the argument is that it was no robbery, and if that is the case, then there would be no crime. He would be acquitted completely. So it is an all or nothing, and we're making an argument that it was nothing, that there was no robbery, and yet we're saying that defense counsel at trial was unreasonable for pursuing the same tack. Okay, so you're going back and you're going to have to retry the murder. If you go back this time and you have to retry it all, you'll do it without any Brady issue? You'll do it with questions relating to what his intent was and whether that would come in. Let's assume that you allow his testimony to come in. Arguably, it already came in when he said he was there just to have a good time when he first went to the bar. Presuming that he testifies again. Yeah, you'll do it with a theft, possibly instruction to go along with robbery. You'll do it with no issues with the voir dire. Why wouldn't you want to go back and do the clean slate trial when you already have to go back anyway for the murder trial? Because at this point, we could focus on the homicide and not have to worry about the robbery at all. And we basically, in essence, I guess you could say we've got that in our pocket. Why would we want to? You want the death penalty. We would be seeking the death penalty, yes. But you wouldn't if the conviction is for theft instead of robbery? Well, the torture aggravating circumstance was also found by the jury. I believe it would have been based on the number of stab wounds. Well, I mean, back, we don't know what the jury would decide. It's very hard. If they were presented with an actual verdict sheet that included the lesser included offense, if they were presented with jury instructions regarding the theft, as opposed to the very minimal instruction regarding the robbery and the theft as a part of that. So we just don't know what the jury would do. I mean, I wonder if that was not deficient on the part of defense counsel, if he got the lesser included offenses for the homicide, not to get the lesser included offenses for robbery. Well, and I think the important aspect is that it's going to presume that defense counsel's performance is deficient in that regard virtually every time they don't ask for a drop count, as they say. So, in other words, if we're going to say we're going to say. I think it's just that it's inexplicable in this case. Maybe you could give me a reason, a strategic reason, a trial strategy reason why he would not do that. Because he was looking for an acquittal on it. He believed that his client's testimony established that. Yeah, but what we're talking about is counsel. The point is, if you're representing a client in a capital case, you would want to do whatever you can. You've got two issues. One, guilt phase. Two, sentencing phase. And why put yourself in a position where you can have an aggravating circumstance for the sentencing phase, assuming he is convicted, when you have a possibility of having the jury pick a lesser included offense that would not be an aggravating circumstance for purposes of capital, for purposes of jury recommending the death penalty. Well, the position is still consistent with there was no robbery. And that's what he's been arguing all along. So to actually throw the theft out is to give the jury something that he doesn't even think should be there. If he gets an acquittal on the robbery, there's nothing. Wouldn't you want that to be there? That there's a possibility that you, the jury, could choose that there was a lesser included offense of theft and not a robbery. And what I get as defense counsel, my strategy is if that happens, then there is not an aggravating circumstance that calls into play, or at least one less aggravating circumstance that calls into play the imposition of the death penalty. That's correct. But you also, the flip side of that is that you could have no robbery at all and no theft. And since the way that this was presented to the jury by the defendant was that there was no robbery, he simply, it would have been consistent with his client's testimony to pursue no robbery and leave the theft alone. It's, okay. If you're defense counsel, you've got somebody who doesn't deny that he hit someone else and this person died, correct? And then the question becomes, do you believe his reasons for why he hit the person and she died, or do you not? It's a, it would seem that you're, the secondary issue, without a doubt, is theft versus robbery, but the secondary issue, how it comes out before a jury, has great implications if he's convicted of murder. And if it has great implications, should not counsel have taken that into account in requesting the jury instruction? Because even if his client loses with respect to theft, he gains with respect to the sentencing phase of the murder conviction. I think that all of that is true and it would have been a reasonable strategy. The problem still is, I don't think it makes this defense counsel's strategy unreasonable. Okay, let's go on to the, go ahead, go ahead. In this regard, if I recall correctly, the state court had, with respect to the failure to request the lesser included offense, that it was not likely, using the phrase not likely, to prejudice the defense without citing to Strickland. Where that doesn't seem to be Strickland's standard, which is reasonable probability that it would. I agree. I think that they simply used some shorthand language. Their analysis. I mean, yeah, not likely sounds like greater than 50%, whereas reasonable probability, we all agree. A little more than 50. A reasonable probability need not be 50. It's the same as in the immigration context. We don't know what it is, but there's a good chance. I believe the phrase usually is something like sufficient to undermine confidence in the outcome of the proceeding. And that doesn't tell you a whole lot either. I think what happened was the Supreme Court got a little lazy with its language. It was applying the right standard. It simply didn't use phrases that it should have. What about the voir dire? I think that the way the court discussed this previously, there was no evidence that this particular juror heard the comment. As a matter of fact, when he was asked if he was. Was there any hearing as to whether this juror heard the comment? No, there wasn't. Shouldn't there have been? I guess we would have to go back and locate the juror. I don't know if at this latest stage he would even remember. I'm quite frankly surprised that the court itself did not dismiss the panel. Because when a juror stands up and says, yeah, I know this defendant, he commits robberies. I mean, that's the sort of thing that contaminates the entire jury panel. Never mind defense counsel. It was a little surprising that it happened. It's a little surprising that they continued to question the juror. I think it was the second or third question. What do you know about him? Something along those lines. How many people were in this group when the comment was made? That I'm not sure of. Based on the numbering, it looked like about 60. I think, as I recall the record, they said it was the second group brought in. The juror who said it was 67, the juror that sat on the jury was 114. So it sounds like they brought him in about 60 at a time. I wanted to follow up. My point was I am surprised that the court itself did not dismiss the entire panel. But I'm also surprised that defense counsel didn't stand up and say, you know, we have a problem here, and approach the judge and say, maybe we ought to get rid of this panel and get a new one. And that would have been a prudent thing to do. The question still is whether this specific juror was tainted. We don't know whether he heard the comment. It could have been a matter of he wasn't paying attention. When he was asked if anybody had discussed the case with him or told him about the case, he said no, just talked about whatever was in the news, I think, with his wife. And he was asked, well, with whatever you know, can you be fair and impartial? And he agreed to do that. So any taint that may have arisen, I think, at that point dissipated. But the question is it isn't an issue of how he perceived he would be able to rule if he were on the jury or vote if he was on the jury. The question is how much taint is there to this juror 114 who people think likely overheard this comment? That's the juror that I was referring to. He was asked can you be fair and impartial. Juror 114 said that? Yes. He was questioned about, and as I said, he mentioned that he had talked about it a little bit with his wife when it was in the news, something along those lines. But those were general voir dires, weren't they? I mean, he wasn't voir dired because of the comment that was made in the courtroom. That's correct. He was just asked, like all other jurors are asked, can you be fair and impartial in this case? That's correct. It was an individual voir dire, but it was pretty general questions. But he wasn't asked, did you hear that statement that was made, and can you put it aside and still be fair? He wasn't asked that question, was he? No, he was not asked that question. But he was asked can you be fair and impartial, and that was his reaction. Okay. This Court has no other questions. Well, you might want to address the cumulative effect of it. As I said. I mean, is that a Brady issue, preclusion of testimony with respect to intent, lesser included charge, voir dire? I mean, and you add all of that on to the fact that you've got a murder conviction that's been overturned and you're going to go back and redo it. Correct. And the only reason you've said that you really want to keep the robbery thing here is to have something in your back pocket with respect to an aggravating circumstance if you get a conviction. That doesn't seem to be. That's not, I'm sorry if I gave kind of a shorthand answer. The fact is he's been convicted of the robbery. And, you know, for all we know, we may go back and get an acquittal on the murder. Yeah, but he was also convicted of murder at one point. At one point he was. He also still stands convicted of the robbery. So essentially I'm being asked to throw all of that away since we already lost part of it. And I guess that's the gist of the question. And I don't see why it would make sense for us to simply give up as serious a conviction as robbery when we believe it's a valid conviction. Well, you also believe if you go back to trial that you're going to get a conviction on both murder and robbery, don't you? I would like to think that we would, yes. And so what your opposing counsel is saying is this trial was infected with things that went wrong in terms of rulings, in terms of how the voir dire was handled, in terms of not disclosing Brady material. And if it's good enough for the murder to have this go back and retry, why isn't it good enough for the robbery? I guess I need to correct a little bit of the beginning of that. We don't necessarily agree with the district court's opinion. There are a lot of reasons other than agreement and disagreement that go into determining an appeal. So we don't believe that this trial was infected with all of these errors. But the judge found that, based on the findings of fact, we don't think that an appeal would have been successful. But in light of that, you did not appeal on the murder. That's correct. It's also a murder that's 23 years old now, and we would rather have gone right back to retry it rather than wait this much more time before doing that. Understood. Thanks, Mr. Barker. Thank you.  I have a few matters in rebuttal, Your Honor. Go ahead. First, just to make clear, we don't dispute that Braegarn committed a theft. Our dispute is whether it was a robbery or just a theft. And my opponent said at certain points in his argument that counsel was trying to get acquittal of the robbery, arguing it's just a robbery. I think that's contradicted by his testimony when he was on the stand at the PCRA hearing. He acknowledged that he was attempting to get a theft, get the jury to believe that a theft occurred because she was already dead at the time that the intent to steal arose. Our argument is that he was deficient in failing to seek a lesser-included offense, given that that was his strategy. We're not counter-questioning his strategy. Supposing we looked at all of your four major claims and said, well, they're kind of harmless because there's a lot of other evidence. If we were to say something like that, can we accumulate all of those claims and bundle them into the cumulative sort of error? Certainly. If we say something is not harmless, you might. I think it's good for you. But if they're all harmless. If they're all individually harmless, can you still grant cumulative relief? Absolutely. We have numerous examples in that accumulative error point of Strickland, prosecutorial misconduct and evidentiary claims being found cumulatively harmless in the habeas context. And the test you would apply would be the Brecht substantial and injurious effect standard. And then I should just point out that on the point having to do with right to testify, my adversary mentions that the questions that were precluded had to do with early in the evening, not at the time of the homicide. The reason there were no other questions about intent later in the evening, at the time of the homicide, is that the judge instructed counsel not to go there. And counsel said later he would have gone there if he had been allowed. And that's all. Thank you very much, Your Honor. Thank you very much. Thank you. Thank you. Thank you to both counsel for well-presented arguments. And we'll take the matter under advisement. Recess.